| |
|---|
| **UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY** |
| *Caption in Compliance with D.N.J. LBR 9004-1(b)* |
| **OBERMAYER REBMANN MAXWELL & HIPPEL LLP** |
| Edmond M. George, Esquire |
| Michael D. Vagnoni, Esquire (*pro hac vice*) |
| 1120 Route 73, Suite 420 |
| Mount Laurel, NJ 08054-5108 |
| Telephone: (856) 795-3300 |
| Facsimile: (856) 482-0504 |
| E-mail:   edmond.george@obermayer.com |
|                 michael.vagnoni@obermayer.com |
| |
| Counsel to the Debtor and Debtor in Possession |

| | |
|---|---|
| In re: | Chapter 11 |
| KIMO TILE @ MARBLE, LLC, | Case No. 24-20009 (JNP) |
| Debtor. | |

**MOTION OF KIMO TILE @ MARBLE, LLC FOR AN ORDER (I) DETERMINING THAT TILE SETTERS AND TILE FINISHERS UNION OF NEW YORK AND NEW JERSEY, LOCAL NO. 7 OF THE INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS AND BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 PA/DE VIOLATED THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(a), (II) ENFORCING THE AUTOMATIC STAY, (III) AWARDING DAMAGES UNDER 11 U.S.C. § 362(k) FOR STAY VIOLATIONS, AND (IV) GRANTING RELATED RELIEF**

KIMO Tile @ Marble, LLC (the "Debtor"), by and through its undersigned counsel, Obermayer Rebmann Maxwell & Hippel LLP, hereby files the instant Motion for an Order (i) Determining that Tile Setters and Tile Finishers Union of New York and New Jersey, Local No. 7 of the International Union Of Bricklayers and the Allied Craftworkers ("Local 7") and Bricklayers and Allied Craftworkers Local 1 PA/DE ("Local 1" and collectively with Local 7, the "Unions") Violated the Automatic Stay Under 11 U.S.C. § 362(a); (ii) Enforcing the Automatic Stay, (iii) Determining Certain Nonrenewal Notices Null and Void; (iv) Enjoining Further Violations of the Automatic Stay; (v) Requiring the Unions to Perform Under Certain Collective Bargaining

4926-3509-8153 v7

Agreements; (vi) Requiring the Unions to Correct Certain False Statements; (vii) Awarding Damages Under 11 U.S.C. § 362(k), and (viii) Granting Related Relief (the "Motion"); and in support thereof, relies on the attached Declaration of Sasha Kissoondath and states as follows:

## I. JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334(b) as this matter arises in, under, and is related to the above-captioned bankruptcy case (the "Bankruptcy Case"). This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory and legal predicates for the relief sought herein are 11 U.S.C. §§ 105(a), 362(a), and 362(k) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code").

## II. BACKGROUND

4. The Debtor is a ceramic tile and marble installer for large jobs in Pennsylvania and New Jersey (the "Business"), many of which are public works projects for municipalities, school districts, colleges, and other state institutions.

5. In order to bid, win, and retain these public works contracts, the Debtor must be union-affiliated.

6. On October 9, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of New Jersey, Camden Vicinage.

7. The Debtor continues to operate its Business as Debtor in Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

8. On or around October 18, 2024, the Debtor initiated an adversary proceeding

2

against Local 7 (Adv. No. 24-01602-JNP, D.I. #1)[1] (the "Adversary Action"), currently pending before this Court, related to Local 7 and other defendants' interference with the Debtor's contractual relationships.[2]

9. The Adversary Action has not stemmed the Unions' collective actions aimed at foiling the Debtor's reorganization efforts. The instant Motion is intended to address continued violations of the automatic stay provided under Section 362 of the Bankruptcy Code.

### A. The CBAs and Termination Notices

10. Prior to the Petition Date, the Debtor bound itself to a collective bargaining agreement with Local 7, which states it is effective for the period from June 3, 2021, to June 2, 2025 (the "Local 7 CBA"). A true and correct copy of the Local 7 CBA is attached as **Exhibit "A"** hereto.

11. The Local 7 CBA contains, *inter alia*, a clause stating that it automatically renews on a year-to-year basis after June 2, 2025, unless ninety (90) days' notice is given by Local 7 that they intend to let the Local 7 CBA expire – to be certain, while the Local CBA expires on June 2, 2025, it only does so if the requisite notice is provided. *See* **Exhibit "A,"** Art. XXX, Sec. 1.

12. In order for the Local 7 CBA to *not* renew, Local 7 would be required to provide notice to the Debtor on or before March 4, 2025, that it intended to let the CBA expire.

13. Local 7 is already a defendant in the Adversary Action before this Court for its and

---

[1] The Adversary Action alleged that Local 7 and its associated health, welfare, and pension funds (collectively, the "Pension Funds"), together with and through their employees and representatives, had, *inter alia*, conspired to harm the Debtor's business, refused to provide the Debtor with workers for its contract jobs, communicated with the Debtor's contract parties, induced those contract parties to cancel their contracts with the Debtor, caused those contract parties to withhold payments due to the Debtor, and caused the Debtor to suffer more than $400,000.00 in damages. The Debtor sought, *inter alia*, a Preliminary Injunction and Temporary Restraining Order pursuant to 11 U.S.C. § 105(a), Federal Rule of Civil Procedure 65, and Federal Rule of Bankruptcy Procedure 7065, and/or an extension of the automatic stay pursuant to 11 U.S.C § 362(a), to prevent Local 7 and the other defendants from continuing their mistreatment of the Debtor.

[2] The complaint in the Adversary Action was amended on February 17, 2025. (Adv. No. 24-01602-JNP, D.I. #33).

its associated Pension Funds' efforts to cause parties to cancel their contracts with the Debtor.

14. In accordance with the Local 7 CBA, on or about March 3, 2025, Local 7 sent the Debtor a letter stating that it intends to terminate the Local 7 CBA when it expires on June 2, 2025 (the "Local 7 Termination Notice"). A true and correct copy of the Local 7 Termination Notice is attached as **Exhibit "B"** hereto.

15. Similarly, prior to the Petition Date, the Debtor bound itself to a collective bargaining agreement with Local 1, which states it is effective through May 1, 2025 (the "Local 1 CBA" and collectively with the Local 7 CBA, the "CBAs"). The Local 1 CBA is substantially similar to the Local 7 CBA.

16. The Local 1 CBA contains, *inter alia*, a clause stating that it automatically renews on a year-to-year basis after May 1, 2025, unless notice is given by Local 1 that it intends to let the Local 1 CBA expire – to be certain, while the Local 1 CBA expires on May 1, 2025, it only does so if the requisite notice is provided.

17. In order for the Local 1 CBA to not automatically renew, Local 1 was required to provide advanced notice to the Debtor, in a similar manner to the Local 7 CBA, of its intention to let the Local 1 CBA expire.

18. On March 12, 2025, Local 1, on the heels of the Local 7 Termination Notice, forwarded the Debtor a letter via email stating that Local 1 intended to terminate the Local 1 CBA when it expired on May 1, 2025 (the "Local 1 Termination Notice" and collectively with Local 7 Termination Notice, the "Termination Notices"). True and correct copies of the Local 1 Termination Notice and the March 12, 2025, email are attached as **Exhibit "C"** hereto.

19. While the Local 1 Termination Notice is dated February 27, 2025, the Debtor did not receive it until March 12, 2025.

4926-3509-8153 v7

20. The Debtor avers that the Unions colluded in the sending of the Termination Notices and that Local 7 prompted Local 1 to send the Local 1 Termination Notice.[3]

21. The Termination Notices were sent without first obtaining relief from the automatic stay provided in Section 362(a) of the Bankruptcy Code.

**B.** **The Unions' Collusive Actions**

22. The Unions' collusive actions did not stop with the Termination Notices. Instead, the Unions engaged in further collusive efforts to interfere with the Debtor's property and hinder the Debtor's operations, prospective and existing contractual relationships, and efforts to reorganize.

23. Namely, the Unions engaged in collusive actions directed at the Debtor's workers and general contractors, including, *inter alia*, the following:

   i. The Unions ignored the Debtor's request for additional workers, made during the week of March 10, 2025. True and correct copies of the Debtor's communications requesting more workers are attached as **Exhibit "D"** hereto;

   ii. The Unions stated they would not be providing the Debtor with any workers in the future despite the CBAs having not yet been terminated;

   iii. On March 19, 2025, Joe Battaglia ("Battaglia"), a representative of Local 1, went to the Debtor's job site for the Delaware River Joint Task Bridge Commission and informed the Debtor's workers that they needed to find new work as the Unions would not be renewing the CBAs with the Debtor;

   iv. Battaglia informed general contractors that the Unions would not be providing

---

[3] The Unions are inherently linked, as they are both local branches of the International Union of Bricklayers and Allied Craftworkers. Local 7 covers New Jersey, while Local 1 covers Pennsylvania and Delaware. Together, the Unions control the entire bricklayer and craftworker workforce for the Tri-State area.

4926-3509-8153 v7

        any workers to the Debtor as they would not be renewing the CBAs with the Debtor due to an alleged breach of its payment obligations. Battaglia's statements were patently false, as the Debtor is not in breach of its post-petition payment obligations to either of the Unions. The Debtor has not missed a payment to the Unions; and

    v.    As indicated to the Debtor by Union employees, Local 7 published a newsletter stating that Local 7 shut down the Debtor for non-payment of benefits and that Local 7 had obtained a judgment against the Debtor (the "Newsletter").[4]

24. These actions have made both general contractors and the Debtor's workers worried about their continued association with the Debtor and have even caused some general contractors to threaten to cancel contracts and backcharge the Debtor for costs incurred as a result of their depleted workforce. A true and correct copy of a communication from one general contractor is attached as **Exhibit "E"** hereto.

25. The above-detailed actions are an attempt by the Unions to deprive the Debtor of property, cripple operations by not providing it a workforce, deprive the Debtor of future work, and interfere with the Debtor's property interests.

26. Local 7 refuses to provide workers, even after the Debtor sent pictures of the certified checks showing payment of health and welfare benefits. The Unions now require D. H. Cook, the Pension Fund Administrator, to indicate it has received the checks rather than providing workers upon the Debtor's provision of copies of the certified checks. Some weeks later, Local 7 failed to provide the Debtor with any workers even though benefits were paid.

27. The Debtor has never been delinquent in its pension obligations post-petition and

---

[4] The Debtor intends to subpoena Local 7 to obtain a copy of the Newsletter.

6

has paid all pension benefits.

    **C.**    **The Dealings Between the Debtor and Local 7**

28.    The Local 7 Termination Notice and the collusive actions with Local 1 are the latest in a long line of actions taken by Local 7, post-petition and after the initiation of the Adversary Action, to interfere with the Debtor's business and hinder the Debtor's reorganization efforts.[5]

29.    Rather than cooperate with the Debtor, Local 7 decided to alter the course of dealing between it and the Debtor and treat the Debtor differently than it had in the past. Previously, Local 7 treated the Debtor as an Association Member of Local 7 (as defined under the Local 7 CBA). Post-petition, Local 7 has insisted the Debtor make payments on a different timing, which has hampered the Debtor's ability to operate. Obtaining manpower from Local 7 is a daily struggle, as Local 7 often claims insufficient worker supply, another false pretense it uses to deny the Debtor workers.

30.    In the last week, the Local 7 business manager has simply been ignoring the Debtor's repeated requests for manpower.

31.    Local 7's changes to the course of dealing include:

    i.    Insisting the Debtor make benefit payments on the first (1st) of each month, like an Independent Employer (as defined under the Local 7 CBA), instead of on the fifteenth (15th) of each month like other Local 7 Association Members;

    ii.    Refusing to accept or deposit cashier's checks provided for benefit payments and requiring checks for benefit payments be hand-delivered, despite the checks being certified funds and Local 7 previously accepting the checks for

---

[5] In addition to the above, such actions include, *inter alia*: (a) threatening union workers with sanctions or expulsion for working for the Debtor; (b) manipulating payments and provided reporting to stage or contrive noncompliance with agreements; and (c) otherwise making it clear that Local 7 has an issue with the Debtor, destroying the Debtor's operations through strong-arming and bullying.

      benefit payments by any method of delivery; and

    iii.    Refusing to accept an assignment agreement from the Debtor for benefit payments to be made by general contractors directly to Local 7, rather than have the benefits paid by the Debtor, which would provide additional security and assurance of payment.

32.    Post-petition, Local 7 changed its course of dealing with the Debtor, despite their ten (10) year practice and course of dealing. *See* **Exhibit "A,"** Art. IX, Sec. 3(L).

33.    This change in the course of dealing has impaired the Debtor's cash flow and made keeping up with benefit payments virtually impossible.

34.    The Unions claim workers do not want to work for the Debtor, but the workers are only reacting to the Unions' actions in violation of the automatic stay that are intended to undermine the Debtor's relationship with its workers.

35.    The Unions have contacted the Debtor's contract parties and intentionally and inaccurately informed them that the Debtor will be out of business by May 2025.

36.    All of the above actions taken by the Unions, especially the sending of the Termination Notices, constitute willful violations of the automatic stay under Section 362(a). These violations have harmed the Debtor, warranting: (i) voiding the Termination Notices, (ii) requiring the Unions issuing clarifying communications to the Debtor's workers and general contractors they previously contacted, (iii) enjoining the Unions from additional and continued communications with the workers and the general contractors without a copy to the Debtor, (iv) requiring the Unions to immediately begin providing workers to the Debtor in accordance with the CBAs, and (v) awarding damages under Section 362(k).

4926-3509-8153 v7

## III. LEGAL ARGUMENT

### A. The Unions Violated the Automatic Stay Under Section 362(a)

37. Upon the filing of a bankruptcy petition, the automatic stay operates as an injunction barring "all entities" from, *inter alia*, any act to "exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *see also In re Builders Grp. & Dev. Corp.*, 2013 WL 6198203, at *5 (Bankr. D.P.R. Nov. 27, 2013) ("The automatic stay acts as an injunction to protect the property of the estate and becomes operative by the mere filing of a bankruptcy petition.").

38. The automatic stay also protects creditors since "[w]ithout it, certain creditors would be able to pursue their own remedies against the debtor's property." *Cuffee v. Atl. Bus. & Cmty. Dev. Corp. (In re Atl. Bus. & Cmty. Corp.)*, 901 F.2d 325, 327 (3d Cir. 1990).

39. A debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). "The definition of property of the estate is interpreted broadly, and every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of Section 541." *Geltzer v. Soshkin (In re Brizinova)*, 588 B.R. 311, 326 (Bankr. E.D.N.Y. 2018) (quoting *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008)) (brackets and quotation marks omitted).

40. It "includes all kinds of property . . . tangible or intangible[,]" including contracts and agreements. *In re Atl. Bus. & Cmty. Corp.*, 901 F.2d at 327.

41. Here, the automatic stay was violated by: (i) the Unions sending the Termination Notices; and (ii) the Unions' collusive efforts to interfere with and hinder the Debtor's operations, prospective and existing contractual relationships, and efforts to reorganize.

9

### i. The Termination Notices Violated the Automatic Stay

42. While relief from the automatic stay is not needed for a contract or agreement to expire according to its terms post-petition, it is necessary in order to issue a notice of termination. *In re Chautauqua Cap. Corp.*, 135 B.R. 779, 782 (Bankr. W.D. Pa. 1992); *see also Rogue Valley Stations, Inc. v. Birk Oil Co.*, 568 F. Supp. 337, 348 (D. Or. 1983) (finding that "the automatic stay prevents franchisor from sending notice of termination or nonrenewal without first securing appropriate relief from stay from the Bankruptcy Court"); *A. Dan Chisholm, Inc. v. B.P. Oil Inc.* (*In re A. Dan Chisholm, Inc.*), 57 Bankr. 718, 719-20 (Bankr. M.D. Fla. 1986) ("Any notice [or termination] sent in violation of the automatic stay is void and without effect").

43. This is especially true if the contract or agreement has not yet been rejected or deemed rejected. *In re Hejco, Inc.*, 87 B.R. 80, 83 (Bankr. D. Neb. 1988) (holding a notice of termination before a contract is rejected or deemed rejected could be violative of the automatic stay).

44. To be certain, a notice of termination sent without first obtaining relief from the automatic stay violates the automatic stay – this is true even if the termination will not take effect until a future date. *In re Joyner*, 46 B.R. 130, 135 (Bankr. M.D. Ga. 1985); *In re Neely Grp., Inc.*, 2024 WL 2946219, at *3 (Bankr. N.D. Ill. June 11, 2024).

45. Here, the CBAs and the rights thereunder are property of the Debtor's bankruptcy estate, and the Termination Notices attempted to deprive the Debtor of that property and those rights.

46. In bankruptcy, parties seeking to terminate a contract must be granted permission by the court in order to do so. *In re Computer Communications, Inc.*, 824 F.2d 725, 729 (9th Cir. 1987).

47. The Termination Notices wrongfully attempted to adversely affect the Debtor's right to perform its contracts and to terminate the Debtor's rights under the CBAs.

48. As such, the Unions violated the automatic stay by sending the Termination Notices.

### ii. The Unions' Collusive Actions Violated the Automatic Stay

49. The Unions also violated the automatic stay through their collusive actions directed at the Debtor's workers and general contractors, as detailed above.

50. The Unions' actions are an attempt to deprive the Debtor of its workforce and any future work and, ultimately, to cripple its business and thwart its concentrated efforts to reorganize. The Unions have engaged in a concentrated effort to bar the Debtor from doing any union work, which is the Debtor's lifeblood.

51. These actions have interfered with the property of the Debtor's estate as they have hindered and interfered with the Debtor's operations, as well as prospective and existing contractual relationships.

52. The Unions' actions have even caused some general contractors to threaten to backcharge the Debtor as a result of their depleted workforce. *See* **Exhibit "E"** hereto.

### B. The Termination Notices are Null and Void.

53. Termination notices sent in violation of the automatic stay, like all actions taken in violation of the automatic stay, are rendered void and ineffective. *In re RW Meridian LLC*, 564 B.R. 21, 28 (B.A.P. 9th Cir. 2017); *see also In re Joyner*, 46 B.R. at 135-36 (holding that a notice sent in violation of the automatic stay was null and void).

54. As discussed above, the Unions sending the Termination Notices violated the automatic stay.

55. Therefore, because the Termination Notices were sent in violation of the automatic stay, the Termination Notices are void and without effect.

**C. The Debtor Should Be Awarded Damages Under Section 362(k), as the Unions' Violations of the Automatic Stay Are Willful**

56. As a threshold matter, "bankruptcy policy favors… affording a remedy to a debtor damaged by a violation of the stay." *In re Nixon*, 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009).

57. Section 362(k) explicitly states that an "individual" damaged by a willful violation of a stay "shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k); s*ee also In re Miller*, 447 B.R. 425, 433 (Bankr. E.D. Pa. 2011); *Wingard v. Altoona Reg'l Health Sys.* (*In re Wingard*), 382 B.R. 892, 900 (Bankr. W.D. Pa. 2008).

58. The Third Circuit has adopted the position that a corporate debtor is an individual under Section 362(k). *See, e.g.*, *In re Scungio Borst & Associates, LLC*, 652 B.R. 644, 659 n.6 (Bankr. E.D. Pa. 2023).

59. In order to prevail on a claim under Section 362(k), the Trustee must demonstrate by a preponderance of the evidence that (1) the creditor violated the automatic stay, (2) the violation of the stay was willful, and (3) the willful violation caused some injury. *See id.* (citing *Dean v. Carr* (*In re Dean*), 2012 WL 4634291, at *5 (Bankr. M.D. Pa. Oct. 1, 2012); *In re Miller*, 447 B.R. at 433.

60. A violation of the automatic stay is willful when a party commits the violation with knowledge of the bankruptcy. *In re Lansaw*, 853 F.3d 657, 664 n.4 (3d Cir. 2017).

61. Willfulness does not require that a party intended to violate the automatic stay, only that the acts violative of the stay were intentional. *Vu v. Lin* (*In re Vu*), 591 B.R. 596, 603 (Bankr. E.D. Pa. 2018) (quoting *Lansdale Family Rests., Inc. v. Weis Food Serv.* (*In re Lansdale Family*

12

*Rests., Inc.*), 977 F.2d 826, 829 (3d Cir. 1992)).

62. Good faith mistakes of law or dispute as to the party's right to take action do not negate the willfulness of a stay violation. *In re Nixon*, 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009).

63. Here, all three (3) elements are present so as to warrant an award of damages to the Debtor.

64. First, as discussed above, the Unions violated the automatic stay by sending the Termination Notices and through their above-detailed collusive actions directed at the Debtor's workers and general contractors. Local 7 further violated the automatic stay by altering its course of dealing with the Debtor.

65. Second, the Unions' actions violating the automatic stay were undoubtedly willful, as the Unions were well aware of the Debtor's bankruptcy, as evidenced by the Adversary Action, and intentionally took actions in violation of the automatic stay, such as sending the Termination Notices, taking actions directed at the Debtor's workers and general contractors, and changing their course of dealing with the Debtor.

66. The Unions cannot, in good faith, claim these actions were unintentional when they have done everything in their power to cause the Debtor to fail, including refusing to provide workers, contacting the Debtor's workers and general contractors directly, altering their course of dealing with the Debtor, and tortiously interfering with the Debtor's contracts.

67. Finally, the Unions' willful violations of the automatic stay injured the Debtor in an amount to be determined after discovery, including attorney's fees.

68. The Debtor further requests the Court assess punitive damages against the Unions in the amount of $50,000.00 for their repeated and consistent willful violations of the automatic stay.

## IV. CONCLUSION

69. The Debtor respectfully requests the Court enter an Order:

    a. Finding the Unions willfully violated the automatic stay;

    b. Declaring the Termination Notices null and void and the CBAs to be in full force and effect and each extended;

    c. Requiring the Unions, within a set number of days of the entry of an Order granting the Motion, as determined by the Court, to communicate in writing, with a copy to the Debtor, to all general contractors and workers to whom they previously indicated that the Debtor would be out of business in May 2025, clarifying that those statements were incorrect;

    d. Enjoining the Unions from communicating any further information concerning the Debtor to general contractors without also supplying a copy to the Debtor;

    e. Directing the Unions to immediately begin providing workers to the Debtor in accordance with the CBAs;

    f. Awarding damages under Section 362(k); and

    g. Providing such other and further relief as this Court deems just.

Respectfully Submitted,

Dated: March 21, 2025

/s/ Edmond M. George
Edmond M. George, Esquire
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
1120 S NJ 73
Suite 420
Mount Laurel, NJ 08054
*Counsel to KIMO Tile @ Marble, LLC*

14

4926-3509-8153 v7